AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>Cornell CLISBY, Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael WILLIAMS, Allen CARNES and Marcus GENTRY<br><br>*Defendant(s)* | Case No.<br><br>**1:12MJ -348** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  October 2011 - October 2012  in the county of  Hamilton  in the  Southern  District of  Ohio , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and 846 | Conspiracy to possess with intent to distribute and to distribute 1 kilogram or more of heroin. |

This criminal complaint is based on these facts:
See Attachment B.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA John E. Pearson - DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/10/2012

_____
*Judge's signature*

City and state:  Cincinnati, Ohio   Karen L. Litkovitz, U.S. Magistrate Judge
*Printed name and title*

## Attachment A

Your affiant, being duly sworn, hereby does depose and say:

1. I am a Special Agent with the U.S. Drug Enforcement Administration, and have been so employed since January 2000. I have completed basic law enforcement training at the DEA Academy in Quantico, Virginia and have received extensive training in the investigation of offenses involving controlled substances.

2. Facts set forth in this complaint are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case. The sources of my information and beliefs include:

    a. Oral and written reports about this and other investigations which I have received from Special Agents of the DEA and other law enforcement authorities;

    b. Physical surveillance conducted by Special Agents of the DEA and/or other law enforcement authorities and which have been reported to me either directly or indirectly;

3. The Attorney General of the United States has empowered me with Title 21 authority, which authorizes me to seize property, conduct search warrants, and make arrests of persons for violations of the Controlled Substances Act. This affidavit is made in support of a complaint against Cornell CLISBY, Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael WILLIAMS, Allen CARNES and Marcus GENTRY for conspiracy to distribute heroin, in violation of Title 21, United States Code, Section 841 (a)(1) and Title 21, United States Code, section 846. Since this affidavit is being submitted for the limited purpose of establishing probable cause authorizing the arrests of Cornell CLISBY, Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael WILLIAMS, Allen CARNES and Marcus GENTRY. I have not included each and every fact and circumstance which I am aware. I have

set forth only those facts which I believe are necessary to establish such probable cause.

4. Since October 2011, DART and DEA agents have investigated individuals, including Cornell CLISBY, and others, in the Cincinnati Ohio area, suspected of trafficking heroin. In connection with this investigation, agents have sought and obtained court authorization for historical cell site data, live cell site monitoring, search warrants, multiple orders authorizing geographic location data, vehicle trackers and most recently, a Title III intercept on two of Cornell CLISBY's cellular telephones. Through toll analysis, physical surveillance, covert video surveillance, as well as intercepted telephone communications on Cornell CLISBY's cellular telephones, agents have determined that Cornell CLISBY is using Target Telephones 2 and 3 to manage the daily operations of the DTO and to communicate with Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael WILLIAMS, Allen CARNES and Marcus GENTRY, for the purpose of distribution of illegal narcotics in the Southern District of Ohio.

5. On August 15, 2012, the Honorable Michael R. Barrett, District Court Judge for the Southern District of Ohio, signed an order authorizing the intercept of electronic wire communications on a telephone, 859-241-0058, naming Cornell CLISBY as a Target Subject (Target Telephone 2).

6. On September 12, 2012, the Honorable Sr. Judge Michael Barrett, Southern District of Ohio, signed a second order authorizing the interception of electronic wire communications of telephone number 859-241-0058, Target Telephone 2, for a second 30 day period. The same order also authorized the interception of electronic wire communications over cellular telephone number 859-753-6026 (Target Telephone 3).

7. During the DEA wire interceptions over CLISBY's cellular telephones agents were able to identify Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael

2

WILLIAMS, Allen CARNES and Marcus GENTRY and others, as co-conspirators of CLISBY's in the illegal trafficking of heroin.

8. Specifically, on September 6, 2012, at approximately 9:34 p.m., agents intercepted a call between Cornell CLISBY, using Target Telephone 2, and Dorothy CLISBY where Cornell CLISBY tells Dorothy CLISBY to deliver a "four piece"(four ounces of heroin) to "Cuz", who was later positively identified by agents as Marcus GENTRY. CLISBY told Dorothy CLISBY that GENTRY would pay her $7,600 in exchange for the "four piece" ($1,900 per ounce). At approximately 10:00 p.m. agents observed Dorothy CLISBY arrive and enter her residence located at 5503 Kingsway Ct., Cincinnati. Several minutes later agents watched Dorothy CLISBY leave the apartment, walk to her Nissan Maxima and drive away. Agents followed CLISBY directly to the Days Inn parking lot located on 50 Cavalier Blvd, Florence, Kentucky. Several minutes later GENTRY drove up in a 2012 Nissan Maxima, parked next to Dorothy's car and got in with Dorothy. After a few minutes GENTRY got out of Dorothy's car and returned to his car and drove away. Agents followed GENTRY, who began driving in a manner common to drug traffickers who are attempted to detect the presence of law enforcement surveillance. Agents stopped following GENTRY and reestablished surveillance on Dorothy CLISBY who did not move. Thirty minutes after departing, GENTRY returned in a different vehicle, a 2004 Honda, and got back into Dorothy CLISBY's car. After several more minutes, GENTRY got out of CLISBY's car, returned to his Honda and drove to another part of the Days Inn parking lot. Agents later determined through hotel records that GENTRY lived at the Days Inn in room 247. Dorothy CLISBY left the hotel and drove north I-75 to her apartment on 5503 Kingsway Ct, followed by surveillance units.

9. On August 23, 2012, at approximately 12:32 p.m., agents intercepted a telephone call on telephone number 859-241-0058 between Cornell CLISBY and Michael WILLIAMS where WILLIAMS talks about "keys" (cocaine or heroin) that he delivered to one of his customers who returned the drugs because he believed that they were poor quality. WILLIAMS also talked about another customer of his who wanted "another step better" referring to obtaining higher quality narcotics. CLISBY responded that "we got some ...ten times better. WILLIAMS acknowledges and tells CLISBY that "one dude even willing to pay more that's how bad he need it right." (WILLIAMS is telling CLISBY that his customer is willing to pay more money for a higher quality narcotic) CLISBY tells WILLIAMS that he has the high quality narcotics available immediately and WILLIAMS says that he will buy the drugs as soon as possible. CLISBY agrees and says that they can meet in 45 minutes. After intercepting this conversation agents established surveillance on Cornell CLISBY to cover the upcoming drug transaction that later took place between CLISBY and WILLIAMS at the Tri County Mall.

10. Later in the afternoon, TFA Ken Smith observed WILLIAMS arrive at Friday's restaurant next to the Tri County Mall driving his 2003 maroon Jaguar bearing Ohio license FFB 1031 and called CLISBY to say that the lot is too empty. CLISBY agrees and says, "Yeah, just come over, come on over and come to, uh, in the front, where uh, the bar is in the front."
Several minutes later, CDR Niehaus observed WILLIAMS drive across the street to the Tri County Mall to meet CLISBY in the parking lot in front of BJ's Pub parking lot. Agent Hoy observed CLISBY get inside of WILLIAMS' Jaguar on the street in front of BJ's Pub, drive off and park in the lot near CLISBY's Toyota. After several minutes TFA Smith observed CLISBY get out of WILLIAMS' car and return to his vehicle. TFA Smith took digital photographs of the two meeting inside WILLIAMS Jaguar and CLISBY getting out of the car and walking back to

4

his Toyota. Both WILLIAMS and CLISBY drove away at the same time. Agents let CLISBY drive away and followed WILLIAMS from the drug transaction directly to WILLIAMS's residence at 1220 Harrison Ave., Apt 4b, Cincinnati. Ohio.

11. On September 27, 2012, agents intercepted a call where CLISBY called Michael WILLIAMS and told him that he (CLISBY) "chilled out for a couple of days" in response to seeing law enforcement during surveillance on September 24. WILLIAMS told CLISBY that he will be "damned near ready to do any and everything at this point," which agents believe is a reference to the fact that he is nearly out of heroin  CLISBY acknowledged and cautioned WILLIAMS to look out for the police, who he described as "a lot of the little honkies, tinted windows, parked somewhere..." Every two or three days, since the beginning of the electronic intercept of CLISBY's telephone on August 15, 2012, WILLIAMS called CLISBY and placed an order for what agents suspect is heroin. WILLIAMS and CLISBY either met at the Tri County Mall or at WILLIAMS' apartment on Harrison Ave. to deliver the suspected heroin.

12. On September 21, 2012, agents intercepted a call between Dwayne WILLIAMS and Cornell CLISBY. The two had a conversation lasting almost one hour in which they talked about the current state of heroin distribution and where they wanted to see their narcotics distribution evolve in the future. "Only way I'm fuckin with these chemicals if I get a real number. If I can get a $70 number or $75 number...an a...an a...an A P and I can straight pass it we can sell it for 90 or a buck, I'm gonna do it, but I I can't fuck with it no other way, man. If I can't get it that other...If I can't get it like that, bra....Now don't get me wrong. They still got...the amigos still got product out here on these streets but if they givin us a real...if they givin us a number over 75 it ain't gonna work...because it aint gonna work. A nigger need a 7...a nigger need a 70, 75 number, man."

13. During the conversation, of which the preceding paragraph contains just a small portion, Dwayne WILLIAMS talked about the Mexicans flooding the market with low priced heroin that is cut (mixed with inert ingredients to increase the weight) to such an extent that it is difficult to cut again without lowering the quality so much, which meant that users started to complain. He lamented that black heroin distributers in general need to pay $70 or $75 thousand dollars per kilogram of heroin in order to make a reasonable profit. Dwayne told CLISBY that ideally he would like to pay $70-$75 thousand dollars per kilogram and directly resell it for $90-$100 thousand dollars per kilogram without cutting the quality/purity.

14. During the same call with CLISBY, DWAYNE WILLIAMS said, "Give my man right here me and...I I I know I know between the both of us, bro we got about 500 (grams of heroin). I'm gonna be like, yo man, give my man 250, cuz I know he got clean ones and he ain't gonna play no games. You understand what I'm sayin, and he needs some help. Because he told me he lost a couple of his dudes fuckin with them metals. You know what I mean? And they ain't gettin...you know what I mean? So I'm...I'm...was gonna meet with him like yo man, give my man, talkin about you, a 250 so we can clean this shit up we got...you know, at a time cuz I know I know between the both of us, bra, we got 5 hun I got I got 3 hun. I got I got more than that. I got about 450 of this shit.

Agents believe the conversation on September 21 concerned DWAYNE WILLIAMSs admission that he and CLISBY have 500 grams of heroin remaining to distribute and of that amount, WILLIAMS had at least 300 grams. Agents know, through other calls intercepted during the title III that WILLIAMS and CLISBY purchased an unknown quantity of poor quality heroin from Anthony ANDERSON that they could not sell. On August 31, 2012, ANDERSON confirmed this fact when he told CLISBY "that shit just kinda fucked everybody up and it put

me in a fucking bad light." CLISBY responded, "I still got the part and everything untouched." ANDERSON then told CLISBY that "each time I can slide you something." During the call ANDERSON promised to give CLISBY additional heroin each time he makes purchases in excess of what he pays for, in order to make up for the previously delivered "bad batch". The plan calls for CLISBY to blend this extra heroin to improve the overall quality and make it sellable. DWAYNE WILLIAMS wanted CLISBY to purchase 250 grams of heroin from a source of supply in whose quality of heroin WILLIAMS has confidence. WILLIAMS wanted to add this high quality heroin, "clean ones," (heroin taken from uncut kilograms) to the poor quality heroin they possessed but could not sell.

16. On September 24, 2012, agents intercepted an incoming call from Anthony ANDERSON to Cornell CLISBY where ANDERSON, who is Cornell CLISBY's source of supply for heroin, asked CLISBY, "you want me to bring a yard with me" (which agents know is the term used by the pair to request one whole kilogram of heroin). CLISBY responded "Yeah, Yeah…you know we on the same page. I get it huh the info back probably in a few another day or so." Agents believe that CLISBY meant that he needed a day or so to sell the heroin before being able to send the money up to ANDERSON to pay for the kilogram of heroin. Later in the afternoon agents followed CLISBY and others to the Dave and Busters located at 11775 Commons Drive, Springdale, Ohio. ANDERSON and CLISBY met inside the restaurant. While the two were inside, an unknown black male removed two plastic bags from a red Chevy Impala bearing Missouri registration PH2W9K (Hertz rental vehicle) and walked toward the trunk of a gold 4 door Infiniti bearing Ohio registration FHS 3395. A male subject got out of the Infiniti and walked to the rear of the car and opened the trunk. The subject holding the bags looked around the parking lot and placed the bags inside the trunk of the Infiniti. The male subject

7

immediately closed the trunk and scanned the parking lot looking for anything out of the ordinary. After approximately 10 minutes the male subject drove the Infiniti away from the Dave and Busters parking lot. Surveillance units attempted to follow the subject to have his vehicle traffic stopped to search for the suspected kilogram of heroin. The male subject was constantly making erratic maneuvers and kept circling the area going in and out of parking lots, which agents know to be a common counter-surveillance technique used to attempt to elude law enforcement. On that date it worked, and surveillance units were successfully eluded before a marked police unit could conduct a traffic stop.

17. On September 29, 2012, Allen CARNES received 4.5 ounces of heroin from Cornell CLISBY. On September 30, 2012, CARNES received another 4.5 ounces of heroin from CLISBY. Agents obtained information from a DART CS, who has previously provided reliable information to law enforcement, and who met with CARNES in his house on 1337 Byrd Ave., where he/she talked with CARNES about the recently delivered heroin. CARNES told the CS that CLISBY had a new source of supply for the heroin and that the new heroin was dark brown and loose and not chunky. Beginning on July 26th through October 2, 2012, Cornell CLISBY delivered heroin to CARNES' house or a nearby restaurant two or three times each week. Agents have observed many of the deliveries via covert electronic video camera on Byrd Ave., and have monitored the follow up calls where CARNES told CLISBY that he had "some checks for you". Agents have observed that CLISBY almost always drives to CARNES house on 1337 Byrd Ave. to pick up the "checks" (money) and probably deliver additional heroin. Agents have also observed CLISBY delivering what we believe to be heroin and then picking up money, presumably once the heroin is sold.

18. In October 2011, DART and agents from the Cincinnati Resident Office executed a

state search warrant at 1337 Byrd Ave. and recovered 10 ounces of heroin from the basement of the residence. Agents believe through their investigation, and through information provided through the same DART CS, that Cornell CLISBY is the only source of supply CARNES has for heroin.

19. Throughout the course of this investigation agents have observed a clear and consistent pattern used by CLISBY's DTO. CLISBY calls Anthony ANDERSON and makes arrangements to purchase heroin. CLISBY either drives to Columbus to meet ANDERSON, meets ANDERSON at the Tanger Outlet Mall or ANDERSON drives all the way to Cincinnati to deliver the heroin to CLISBY. After CLISBY has the heroin he or Dorothy delivers the narcotics to Allen CARNES, Michael WILLIAMS and Marcus GENTRY in multi ounce quantities, as referenced in paragraphs 8-10, 15 and 16 herein. Several days later CLISBY receives calls from CARNES, WILLIAMS, and/or CLISBY who say that the "checks" are in or the "paperwork" is ready which means that the previously delivered heroin is sold and the money is ready to be picked up, as referenced in paragraph 17 herein. CLISBY makes arrangements to pick up the money and then in turn delivers what he owes to ANDERSON and the whole process begins again.

20. Based on the above facts and circumstances listed above, and on my experience and training, I have reason to believe, and do believe, Cornell CLISBY, Dorothy CLISBY, Dwayne WILLIAMS, Anthony ANDERSON, Michael WILLIAMS, Allen CARNES, and Marcus GENTRY conspired to possess with intent to distribute and did distribute 1 kilogram or more of a Schedule I controlled substance, to-wit, heroin, in violation of Title 21, United States Codes, Sections 841 and 846. Further, your affiant sayeth naught.

*John E. Pearson*
John E. Pearson
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me on this ____ day of October 2012

*Karen L. Litkovitz*
HONORABLE KAREN L. LITKOVITZ
UNITED STATES MAGISTRATE JUDGE